[Cite as *Wolf-Sabatino v. Sabatino*, 2014-Ohio-1252.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Linda Ann Wolf-Sabatino, | : | |
| Plaintiff-Appellee, | : | No. 12AP-1042 |
| | | (C.P.C. No. 08DR-07-2610) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Philip Ronald Sabatino, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 27, 2014

*Tyack, Blackmore, Liston & Nigh Co., L.P.A., Thomas M. Tyack* and *Margaret L. Blackmore*, for appellee.

*Scott N. Friedman* and *Elizabeth A. Johnson*, for appellant.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

DORRIAN, J.

{¶ 1} Defendant-appellant, Philip Ronald Sabatino ("appellant"), appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, determining the amount of child support to be paid to plaintiff-appellee, Linda A. Wolf-Sabatino ("appellee"), pursuant to the parties' divorce. Because we conclude that the trial court abused its discretion in calculating the child support order, we reverse.

{¶ 2} This is the third appeal arising from the parties' divorce proceeding. *See Wolf-Sabatino v. Sabatino*, 10th Dist. No. 10AP-1161, 2011-Ohio-6819 ("*Wolf-Sabatino I*"); *Wolf-Sabatino v. Sabatino*, 10th Dist. No. 12AP-307, 2012-Ohio-6232 ("*Wolf-Sabatino II*"). The parties were married on June 25, 1994, and one child was born as issue of the marriage on November 26, 1997. *Wolf-Sabatino I* at ¶ 2. Appellee filed a complaint

for legal separation on July 1, 2008, which was later amended to a complaint for divorce. *Id.* Appellant filed an answer and counterclaim for divorce on August 6, 2008. *Id.* On August 12, 2010, the trial court issued a judgment entry—decree of divorce granting a divorce and addressing the disputed issues (the "August 2010 judgment"). *Id.* at ¶ 5. The trial court later issued a supplemental judgment entry on December 10, 2010, affirming the August 2010 judgment and granting the divorce. *Id.* In the August 2010 judgment, the trial court determined that appellant had a deemed income of $144,789 per year and appellee had a deemed income of $60,000 per year. *Id.* at ¶ 89. Based on its determination of the parties' deemed income, the trial court completed a child support computation worksheet for parents with a shared parenting order, concluding that the parties had a combined annual income for child support purposes of $140,667. *Id.* Pursuant to the statutory child support schedule, the trial court ordered appellant to pay $670.72 per month in child support. *Id.*

{¶ 3} In *Wolf-Sabatino I*, this court affirmed in part and reversed in part the August 2010 judgment. *Id.* at ¶ 109. With respect to the child support order, the court concluded that the trial court erred in calculating appellant's gross income for purposes of child support. *Id.* at ¶ 87-100. The court remanded the case to the trial court for an evidentiary hearing on the parties' shared parenting plan, a recalculation of the child support award, and a redetermination of whether the marital residence was separate or marital property. *Id.* at ¶ 109.

{¶ 4} On November 15, 2012, the trial court issued a judgment entry addressing the child support calculation (the "November 2012 judgment"). The trial court concluded that appellant had an average gross income of $1,003,634 per year and ordered appellant to pay child support of $8,475.42 per month.

{¶ 5} Appellant appeals from the trial court's judgment, asserting four errors for this court's review:

> I. THE TRIAL COURT ERRED IN CALCULATING THE GROSS INCOME OF THE PARTIES, PURSUANT TO R.C. 3119.01.
>
> II. WHERE THE PARTIES' COMBINED INCOME EXCEEDED $150,000, THE COURT ERRED BY PREPARING A CHILD SUPPORT WORKSHEET, AND BASING THE CHILD

SUPPORT ORDER ON THE WORKSHEET, INSTEAD OF A CASE-BY-CASE REVIEW OF THE PARTIES' LIFESTYLE AND THE CHILD'S NEEDS, PURSUANT TO R.C. 3119.04(B).

III. THE COURT ERRED BY FAILING TO CONSIDER ADDITIONAL DEVIATION FACTORS, PURSUANT TO R.C. 3119.22 AND 3119.23, WHEN ESTABLISHING RON'S CHILD SUPPORT OBLIGATION.

IV. THE COURT ERRED, FROM A WITHHOLDING PERSPECTIVE, BY ORDERING RON TO PAY MORE SUPPORT PER MONTH THAN HIS NET, TAKE HOME PAY FROM HIS BASE SALARY.

## I. Procedure for Determining Child Support

{¶ 6} Child support orders are reviewed under an abuse-of-discretion standard. *Morrow v. Becker*, 138 Ohio St.3d 11, 2013-Ohio-4542, ¶ 9. An abuse of discretion occurs where a trial court's decision is "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 7} "The underlying purpose of Ohio's child support legislation * * * is to meet the current needs of the minor child." *Harbour v. Ridgeway*, 10th Dist. No. 04AP-350, 2005-Ohio-2643, ¶ 34. *See also Bates v. Bates*, 10th Dist. No. 04AP-137, 2005-Ohio-3374, ¶ 21 ("We are mindful that the overriding concern in calculating child support is the best interest of the child for whom support is being awarded."). The starting point for determining the proper amount of child support to be paid is parental income, defined as gross income for those employed to full capacity or gross income plus potential income for those not employed to full capacity. *Morrow* at ¶ 11; R.C. 3119.01(C)(5). Gross income is defined in part as "the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable, and includes income from salaries, wages, overtime pay, and bonuses * * * royalties; tips; rents; dividends; * * * interest; * * * and all other sources of income." R.C. 3119.01(C)(7). The law further provides that some items are not considered gross income, including "[n]onrecurring or unsustainable income or cash flow items." R.C. 3119.01(C)(7)(e). "The determination of gross income is a factual finding, which is normally reviewed using the 'some competent, credible evidence' standard." *Dannaher v. Newbold*, 10th Dist. No. 05AP-172, 2007-Ohio-2936, ¶ 14.

{¶ 8}   The Ohio Revised Code contains a basic child support schedule to be used when calculating the amount of child support to be paid pursuant to a child support order. R.C. 3119.021. The law also provides a child support computation worksheet to be used in calculating the amount of child support to be paid. R.C. 3119.022. The basic child support schedule and computation worksheet apply when the parents' combined gross income is between $6,600 and $150,000 per year. R.C. 3119.021. In cases where the basic schedule and worksheet apply, the guideline amount is rebuttably presumed to be the correct amount of child support to be awarded. R.C. 3119.03; *Wolf-Sabatino I* at ¶ 88. When the parents' combined gross income is greater than $150,000 per year, a court "shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the parents." R.C. 3119.04(B).

{¶ 9}   In his first assignment of error, appellant asserts that the trial court erred in calculating the parties' gross income in the November 2012 judgment, claiming that specific items were improperly included or excluded from the income calculations. However, even if we agree with respect to all of appellant's specific claims, it appears that the parties would still have a combined gross income of greater than $150,000. Therefore, we begin our analysis with the second assignment of error, in which appellant argues that the trial court failed to conduct the statutorily required case-by-case analysis in determining the appropriate child support award.

## II. Failure to Conduct a Case-By-Case Analysis of the Needs and the Standard of Living of the Child and the Parties

{¶ 10}  In his second assignment of error, appellant claims that the trial court erred by preparing a child support worksheet and basing its child support order on the worksheet, rather than conducting a case-by-case review of the standard of living and needs of the child and the parties. Appellant argues that, despite the language in the November 2012 judgment indicating that the court considered the relevant statutory factors, the appropriate case law, and the related evidence, the court failed to perform a case-by-case analysis to determine the appropriate amount of child support and, instead, relied solely on an amount calculated under the child support worksheet based on its recalculation of appellant's income.

{¶ 11} In the November 2012 judgment, the trial court determined that appellant had an average gross income of $1,003,634 per year. The court also completed a child support computation worksheet that calculated the parties' combined annual income to be $1,042,361. R.C. 3119.04(B) provides the method for determining the appropriate child support obligation when the parents' combined income is greater than $150,000 per year:

> If the combined gross income of both parents is greater than one hundred fifty thousand dollars per year, the court, with respect to a court child support order, or the child support enforcement agency, with respect to an administrative child support order, shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the parents. The court or agency shall compute a basic combined child support obligation that is no less than the obligation that would have been computed under the basic child support schedule and applicable worksheet for a combined gross income of one hundred fifty thousand dollars, unless the court or agency determines that it would be unjust or inappropriate and would not be in the best interest of the child, obligor, or obligee to order that amount. If the court or agency makes such a determination, it shall enter in the journal the figure, determination, and findings.

{¶ 12} As this court explained in *Kuper v. Halbach*, 10th Dist. No. 09AP-899, 2010-Ohio-3020, under R.C. 3119.04(B), the trial court is bound by three requirements when the parties' combined income exceeds $150,000:

> The court must: (1) set the child support amount based on the qualitative needs and standard of living of the children and parents; (2) ensure that the amount set is not less than the $150,000-equivalent, unless awarding the $150,000-equivalent would be inappropriate (i.e., would be too much); and (3) if it decides the $150,000-equivalent is inappropriate or unjust (i.e., awards less), then journalize the justification for that decision.

*Id.* at ¶ 84.

{¶ 13} Under the basic child support schedule and applicable worksheet, the trial court determined the parties' combined basic child support obligation to be $105,751 per year. After making certain adjustments to the total obligation for health insurance and

other medical support, the court ordered appellant to pay child support of $99,710.87 per year. The child support worksheet completed by the court indicates that the $150,000-equivalent would have been an annual child support award of $15,218. Thus, the trial court fulfilled the requirement of ensuring that the amount of child support was not less than the $150,000-equivalent. *Id.*

{¶ 14} Appellant asserts that the trial court relied solely on the child support calculation worksheet and did not set the child support amount based on a qualitative, case-by-case analysis of the needs and the standard of living of the child and the parties. To the extent that appellant argues that the trial court erred by preparing the child support worksheet, this allowed the trial court to ensure that its final child support order was not less than the $150,000-equivalent. Although we conclude that the trial court did not err by preparing the worksheet, we will consider appellant's claim that the trial court abused its discretion by relying solely on the worksheet and failing to perform a case-by-case analysis.

{¶ 15} Under the child support computation worksheet, the trial court computed appellant's child support obligation to be $8,475.42 per month. In the November 2012 judgment, the trial court ordered appellant to pay that same amount, $8,475.42 per month, in child support. The court stated that, in arriving at its decision, it considered each and every relevant statutory factor and the related supporting evidence. The court further stated that it specifically found that the statutory calculations resulted in a child support award that was in the child's best interests and reflected a standard of living comparable to that he would have enjoyed if the marriage remained intact. This court has previously held that R.C. 3119.04(B) does not require any explanation of the trial court's decision unless it orders less child support than the amount that would apply for a combined income of $150,000. *See Guertin v. Guertin*, 10th Dist. No. 06AP-1101, 2007-Ohio-2008, ¶ 14. Under the specific circumstances of this case, however, we conclude that the trial court failed to demonstrate that the child support order was based on a case-by-case analysis of the needs and the lifestyle of the child and the parties.

{¶ 16} At trial in 2009, appellant testified that the child attended a private school and enjoyed numerous sports, including skiing and snowboarding. There was also evidence regarding the parties' vacation homes in Florida. In her brief, appellee argues

that the child is accustomed to a lifestyle "well beyond" that enjoyed by most other children. Under both the August 2010 judgment and the November 2012 judgment, appellant was required to pay the cost of the child's medical insurance and private school tuition. Despite the fact that appellant continued to bear the cost of the child's health insurance and private school tuition, under the November 2012 judgment, the child support order increased more than 1,000 percent. Additionally, appellee was awarded possession of the former marital residence, thereby ensuring a residence consistent with the lifestyle prior to the divorce when the child was in appellee's custody. During the time between the two orders, no additional direct evidence related to the child's needs was introduced. In fact, in a deposition conducted in August 2011, appellee testified regarding family vacations that she and the child took to Colorado and Florida, suggesting that, even under the August 2010 judgment, the child continued to enjoy a comfortable lifestyle.

{¶ 17} The trial court failed to provide any explanation of the substantial increase in the amount of child support ordered, other than its recalculation of appellant's gross income. This suggests that the trial court simply relied on the child support worksheet calculation, rather than considering the needs and the standard of living of the child and the parties. As appellant notes, in 2008, appellee prepared an estimate of her monthly expenses, including utilities, groceries, and dining out, but not including additional personal expenses for herself or for the child. At trial, appellee testified that this estimate was generally accurate. Adding up each of the categories in appellee's estimate, it appears that appellee estimated her average expenses as approximately $6,000 to $6,500 per month. Thus, the child support order under the November 2012 judgment significantly exceeded even appellee's own estimate of her expenses. Yet, the trial court did not offer any specific explanation of how the needs and the standard of living of the child and the parties resulted in a child support order that was more than twelve times greater than the order under the August 2010 judgment and nearly one-third greater than appellee's own estimated monthly budget. *Compare Guertin* at ¶ 9 ("[A] review of the trial court's decision reveals that the court made several independent findings that related to the needs and the standard of living of the children."). Given the history and the circumstances presented in this appeal, the trial court's broad declaration that it considered the relevant factors and equitable circumstances is insufficient. We conclude

that the trial court relied primarily on the child support calculation worksheet and abused its discretion by failing to conduct a case-by-case analysis of the needs and standard of living of the child and the parties.

{¶ 18} Accordingly, we sustain appellant's second assignment of error.

### III. Calculation of the Parties' Gross Income

{¶ 19} Next, we turn to appellant's first assignment of error, in which he asserts that the trial court erred in calculating the gross income of the parties. In the November 2012 judgment, the trial court did not make any adjustments to its calculation of appellee's gross income, concluding that her only income consisted of $60,000 per year in spousal support under the parties' premarital agreement. In both the August 2010 judgment and the November 2012 judgment, the trial court calculated appellant's income by taking a three-year average of his income from 2007 through 2009. When appropriate, the court may average income over a reasonable period of years. R.C. 3119.05(H); *Wolf-Sabatino I* at ¶ 97. Appellant does not object to the income-averaging approach, but he asserts that the trial court erred by excluding certain items from its calculation of appellee's gross income and by including certain items in its calculation of his gross income. We will consider in turn each of these specific items addressed as part of appellant's first assignment of error.

#### A. Calculation of Appellee's Gross Income

{¶ 20} Appellant first argues that the trial court abused its discretion by failing to include in its calculation of appellee's income any income received from her interest in a real estate partnership between appellee, her mother, and her siblings, called "JELM." In the August 2010 judgment, the trial court noted that the parties stipulated that appellee's interest in JELM was her separate property. In 2007, the parties' jointly filed federal tax return reflected that they received rental real estate income, distributions, and interest from JELM. Similarly, appellee's separately filed federal tax return for 2008 reflected that she received interest and distributions from JELM. Although the parties stipulated that appellee's interest in JELM was her separate property, the trial court did not include any income from JELM in its calculation of appellee's gross income. Under R.C. 3119.01(C)(7), gross income includes rents, dividends, and interest. There was competent, credible evidence demonstrating that appellee received income from her interest in JELM.

Therefore, the trial court abused its discretion by failing to attribute this income to appellee in its calculation of her gross income.

{¶ 21} Next, appellant asserts that the trial court abused its discretion by failing to include in its calculation of appellee's income any income received from her interest in ROLL Development, LLC. ROLL Development is a limited liability corporation in which appellee and her daughter each hold a 25-percent interest and appellant holds the remaining 50-percent interest. The parties stipulated that appellee's 25-percent interest in ROLL Development was her separate property. However, appellant only points to one specific item of alleged income from ROLL Development—i.e., royalties of $24,613 reported on appellee's 2008 federal tax return.　As discussed more fully below, it appears that this is appellee's share of a royalty payment for the sale of mineral rights associated with property owned by ROLL Development, which we conclude under these circumstances to be nonrecurring income.　Moreover, in his brief, appellant admits that this was nonrecurring income. Because appellant does not cite to any other specific income from ROLL Development that the trial court failed to consider, we conclude that the trial court did not abuse its discretion by failing to include this in its calculation of appellee's gross income.

{¶ 22} Appellant further asserts that the trial court erred by failing to include dividends from UBS investment accounts in its calculation of appellee's gross income. In the August 2010 judgment, the trial court addressed two UBS investment accounts held by the parties that had a total value of $1,590,010. The court awarded $944,879, or approximately 59 percent of the value, to appellee and awarded the remaining $645,131 (41 percent of the total value) to appellant. However, in calculating the parties' gross incomes, the court allocated all investment income and dividends received by the parties in 2007 as part of appellant's gross income. Similarly, the trial court failed to attribute any dividend income to appellee for 2008 or 2009, when the parties filed separate income tax returns. As this court noted in *Wolf-Sabatino I*, the statutory definition of gross income indicates that "the General Assembly intended for an expansive definition of gross income for child support purposes." *Wolf-Sabatino I* at ¶ 91. That statutory definition expressly includes dividends within the definition of gross income. R.C. 3119.01(C)(7). Therefore, we conclude that the trial court abused its discretion by failing to determine whether

appellee received any dividends from these accounts and by allocating any dividends appellee received as part of her gross income. *See McQuinn v. McQuinn*, 110 Ohio App.3d 296, 300-01 (12th Dist.1996) (holding that wife's share of her husband's pension account, which was in pay status, must be included in her gross income for purposes of child support calculation).

{¶ 23} Appellant also argues that the trial court erred by failing to impute income to appellee based on her voluntary unemployment. Appellant claims that appellee has a nursing degree and had previously worked for 13 years as a full-time nurse. Appellant argues that, because the parties' son was a pre-teen and attended school full time, it was not necessary for appellee to stay home to care for him. The law provides that, for a parent who is unemployed or underemployed, the trial court may consider any potential income of that parent, including imputed income that the court determines the parent would have earned if fully employed. R.C. 3119.01(C)(5)(b), 3119.01(C)(11)(a). Appellee asserts that no evidence was presented to establish an appropriate level of imputed income, and, at oral argument, appellant's counsel conceded that no evidence was introduced to demonstrate appellee's potential income if fully employed. Because there was no evidence introduced with respect to appellee's potential income from employment, the trial court did not abuse its discretion by failing to include imputed employment income in its calculation of appellee's gross income.

{¶ 24} Finally, with respect to the trial court's calculation of appellee's gross income, appellant asserts that the trial court erred by failing to include imputed income from her share of her investments in JELM, ROLL Development, and the marital property and assets she received pursuant to the divorce, including her share of the parties' investment accounts with UBS. The general definition of gross income includes "potential cash flow from any source." R.C. 3119.01(C)(7). Potential income for a voluntarily unemployed or underemployed parent also includes "[i]mputed income from any nonincome-producing assets of a parent, as determined from the local passbook savings rate or another appropriate rate as determined by the court." R.C. 3119.01(C)(11)(b). With respect to some of the items appellant cites, such as appellee's share of JELM and the UBS investment accounts, appellant argues that the trial court failed to properly allocate the income from these assets; therefore, these may not qualify as "nonincome-producing

assets" subject to being included as imputed potential income under R.C. 3119.01(C)(11)(b). On remand, the trial court shall determine whether appellee holds any "nonincome-producing assets" and shall determine whether potential income, as defined under R.C. 3119.01(C)(11), should be included in its calculation of appellee's gross income.

### B. Calculation of Appellant's Gross Income

{¶ 25} Next, we turn to appellant's assertions of error with respect to the trial court's calculation of his gross income. Initially, we note that, in *Wolf-Sabatino I*, this court referred to several categories and amounts of income reported on appellant's federal tax returns from 2007 through 2009, including W-2 wages, taxable interest, dividends, taxable refunds, business income (or losses), capital gains (or losses), and other income. *Wolf-Sabatino I* at ¶ 95.  It appears that, in determining appellant's gross income for the November 2012 judgment, the trial court relied *exclusively* on those income categories and amounts referred to in *Wolf-Sabatino I*. Reading paragraph 95 in the context of the full *Wolf-Sabatino I* decision, however, it is clear that this court referred to those categories and amounts of income as representative examples of the items to be considered in calculating appellant's income, rather than an exclusive list for the trial court to rely on in making its decision on remand. As the *Wolf-Sabatino I* decision noted, " '[f]ederal and state tax documents provide a proper *starting point* to calculate a parent's income, but they are *not* the sole factor for the trial court to consider.' " (Emphasis added.) *Wolf-Sabatino I* at ¶ 96, quoting *Foster v. Foster*, 150 Ohio App.3d 298, 2002-Ohio-6390, ¶ 11 (12th Dist.). In light of this principle, we consider appellant's specific claims regarding the trial court's calculation of his gross income.

{¶ 26} Appellant asserts that the trial court erred in calculating his gross income by failing to deduct spousal support payments made to appellee. A review of the November 2012 judgment and the associated child support computation worksheet indicates that, while the trial court included the spousal support as part of appellee's gross income, it failed to deduct those spousal support payments from appellant's gross income. Under R.C. 3119.05(B), when a court computes the amount of child support to be paid, "the amount of any court-ordered spousal support actually paid shall be deducted from the gross income of that parent." *See also Kuper* at ¶ 69. In calculating the child support component of the August 2010 judgment, the trial court deducted spousal support from

appellant's income. However, the child support computation worksheet filed with the November 2012 judgment does not reflect any deduction from appellant's income for spousal support paid. We conclude, therefore, that the trial court abused its discretion by failing to deduct the amount of spousal support paid from its calculation of appellant's gross income.

{¶ 27} Appellant argues that the trial court erred by including taxable refunds of state and local income taxes as part of its calculation of his gross income. Similarly, he argues that the trial court erred by including royalties from the sale of mineral rights and capital gains from the sale of business property in its calculation of his gross income. We conclude that each of these asserted errors involves determining whether the particular item was nonrecurring or unsustainable income. Under R.C. 3119.01(C)(7)(3), "[n]onrecurring or unsustainable income or cash flow items" are not considered gross income for purposes of calculating child support. The law defines nonrecurring or unsustainable income or cash flow items as those that the parent "receives in any year or for any number of years not to exceed three years that the parent does not expect to continue to receive on a regular basis." R.C. 3119.01(C)(8).

{¶ 28} Determination of whether a particular type of income is "nonrecurring or unsustainable" requires a close review of the specific facts in a given case. In the context of considering commission income, this court has previously held that such income does not qualify as nonrecurring when the recipient receives it annually, despite the fact that the amount of the commission income may vary from year to year. *Poling v. Poling*, 10th Dist. No. 13AP-189, 2013-Ohio-5141, ¶ 10-11 (holding that commission income was not nonrecurring because the appellant received commissions each year in the five-year period prior to the parties' divorce, despite the fact that the amount of the commissions varied widely during that period). *See also Gerlach v. Gerlach*, 10th Dist. No. 03AP-22, 2004-Ohio-1607, ¶ 16 (holding that income from commission sales was not nonrecurring because he received it in two consecutive years prior to the parties' divorce and did not testify that the income would cease, although he testified it might slow down).

{¶ 29} By contrast, courts have frequently held that one-time income is nonrecurring or unsustainable income and should be excluded from the recipient's gross income for purposes of calculating child support. In *Maloof-Wolf v. Wolf*, 8th Dist. No.

94114, 2011-Ohio-701, for example, the court of appeals concluded that a husband's share of a settlement payment received pursuant to a trademark infringement lawsuit constituted nonrecurring or unsustainable income. *Id.* at ¶ 55. *See also Dawson v. Dawson*, 3d Dist. No. 14-09-08, 2009-Ohio-6029, ¶ 44-46 (holding that settlement award from prior employer was nonrecurring or unsustainable income); *Watral v. Watral*, 9th Dist. No. 05CA0017-M, 2005-Ohio-6917, ¶ 17 (holding that a single, lump-sum retroactive Social Security disability benefit payment was a nonrecurring or unsustainable cash flow item). Similarly, in *Cooper v. Cooper*, 12th Dist. No. CA2003-05-038, 2004-Ohio-1368, the court of appeals found that a signing bonus from the husband's employer was nonrecurring or unsustainable income because there was a letter from the employer indicating that it was a one-time bonus. *Id.* at ¶ 25. A payment the husband received for attending advisory boards was also nonrecurring income based on his testimony that the advisory boards only occurred once. *Id.* The court also concluded that the funds the husband received for his portion of the equity in the marital residence when it was sold constituted nonrecurring or unsustainable income.  *Id.* at ¶ 26.

{¶ 30} In this case, the trial court included in its calculation of appellant's gross income refunds of state and local income taxes reported on appellant's federal tax returns in 2007 and 2008. Appellant's federal income tax forms indicate that he received $40,150 in taxable refunds in 2007 and $58,155 in taxable refunds in 2008. Appellant did not report any taxable refunds in 2009. Although appellant reported receiving taxable refunds in two of the three years the trial court examined, we conclude that these refunds constitute irregular or unsustainable cash flow items that should not be included in his gross income for purposes of calculating child support.

{¶ 31} In *Bruno v. Bruno*, 10th Dist. No. 04AP-1381, 2005-Ohio-3812, this court reversed a child support order arising from a motion to modify child support. The trial court calculated the father's income to be $150,000, based on the fact that he earned $150,622 during the 12 months prior to the hearing on the motion to modify and that he had earned income in excess of $150,000 in several years prior to the hearing.  *Id.* at ¶ 11. The father argued that the trial court erred in calculating his income because he had changed employment approximately six months prior to the hearing. The father testified that his new employment had an initial probationary period with a gross income of only

$5,000 per month, which would equate to an annual salary of $60,000. Although he was supposed to begin earning $12,500 per month after the probationary period with the new employer, which would result in an annual salary of $150,000, there was no guarantee that he would successfully complete the probationary period and begin earning that increased salary. *Id.* at ¶ 14. The court of appeals concluded that, because there was no evidence presented that the father expected to continue to receive on a regular basis the same income he received from his prior employment (i.e., $150,000 per year or more), the trial court erred by using his earnings during the 12 months prior to the hearing to determine his income because it included 6 months of income earned at the higher level of his prior employment. *Id.* at ¶ 14.

{¶ 32} Appellant reported receiving taxable refunds in two of the three years the trial court examined. However, during the decade prior to the parties' divorce, appellant only reported receiving such refunds four out of nine years.[1] One of appellant's accountants explained that these taxable refunds were based on estimated tax payments related to appellant's businesses made throughout the year. When the estimated payments result in an overpayment, the excess payment is refunded. Thus, whether appellant receives taxable refunds would depend on the accuracy of his estimated tax payments. While appellant reported this type of cash flow more than once, we conclude that it is more analogous to the unsustainable income recognized in *Bruno* than the variable, but regularly received commission-based payments discussed in *Poling*. In *Poling*, the amount of the commission-based payments varied each year, but the individual received at least some payment each year that the trial considered. *Poling* at ¶ 10-11. By contrast, in this case, appellant's federal tax filings indicate that he received taxable refunds on an irregular basis, and there was no evidence demonstrating that he would receive this type of cash flow on a recurring basis in the future. Under these circumstances, we conclude that the trial court abused its discretion by including taxable refunds of state and local income taxes in its calculation of appellant's gross income because these were items of nonrecurring income.

---

[1] This court's review of appellant's tax returns from 2000 through 2009 excludes his return for the year 2006, which could not be located in the record filed with the court.

{¶ 33} Appellant also argues that the trial court erred by including income he received in 2008 from the sale of mineral rights associated with certain properties. On appellant's 2008 federal tax return, he reported $603,566 in income from rental real estate, royalties, partnerships, and the like. The Schedule E forms filed with appellant's 2008 federal tax return indicate that this total included $353,071 in royalties, comprised of $258,273 for Hidden Acres East Apartment Community, $49,228 for ROLL Development,[2] $38,790 for T&R Development, Inc., and $6,780 for T&R Properties, Inc. Appellant also reported $203,066 in business income on his 2008 federal tax return. The Schedule C forms filed with his 2008 federal tax return and associated explanatory documents indicate that his reported business income included $625,266 in "royalty advance income" associated with Mt. Pisgah Development, LLC.  Appellant argues that these royalties were one-time payments received for the sale of mineral rights associated with properties owned by these companies and that they should have been excluded from the trial court's calculation of his gross income.

{¶ 34} As explained above, state and federal tax documents can serve as a starting point for determining a parent's gross income for purposes of child support. *Wolf-Sabatino I* at ¶ 96. Appellant's federal tax returns indicate that he regularly reported income or losses in the general categories of rental real estate, royalties, and the like (line 17 of his federal Form 1040 tax returns) and business income (line 12 of his federal Form 1040 tax returns). Therefore, the trial court did not err by examining appellant's income or losses in these general categories as reported on his federal tax returns. Yet, in examining appellant's tax returns for the three-year period that the trial court considered, it appears that he only reported receiving royalty payments in 2008. Moreover, in the decade prior to the parties' divorce, appellant did not report royalty payments on his Schedule C or Schedule E forms in any year except 2008. Thus, there was no evidence

---

[2] In his brief, appellant asserts that the royalty payment of $49,228 was associated with Mero Development, LLC. However, his 2008 federal tax return indicates that it was associated with ROLL Development. As noted in ¶ 21 above, appellant concedes that, in 2008, appellee received a nonrecurring royalty payment associated with ROLL Development of $24,613. Appellee owns 25 percent of ROLL Development. A royalty payment of $49,228 is approximately twice the amount that appellee received in 2008, which appears to be consistent with appellant's 50 percent ownership share of ROLL Development. Therefore, we conclude that this royalty payment was actually associated with ROLL Development.

that appellant received recurring royalty payments in the past or expected to receive them in the future. We conclude that, under these circumstances, the royalty payments reported on appellant's 2008 federal tax return were a nonrecurring cash flow item, analogous to a settlement or bonus payment. *See, e.g., Maloof-Wolf* at ¶ 55; *Cooper* at ¶ 25. Therefore, the trial court abused its discretion by including these royalty payments in its calculation of appellant's gross income.

{¶ 35} Appellant further argues that the trial court erred by including in its calculation of his gross income the share of his capital gains in 2007 derived from a sale of business property. On his 2007 federal tax return, appellant reported total capital gains of $1,538,202. In 2008 and 2009, appellant reported capital losses of $1,500 each year. The trial court included these capital gains and losses in its calculation of appellant's gross income. Appellant argues that the capital gains he reported in 2007 included $1,210,270 from the sale of investment property, which should be considered nonrecurring or unsustainable income for purposes of the child support calculation.

{¶ 36} Appellee asserts that capital gains were a major income item for appellant and, therefore, should be included in his gross income for calculating child support.[3] Appellant reported capital gains or losses each year during the three-year period that the trial court reviewed; therefore, we conclude that the trial court did not err by examining his capital gains and losses in calculating appellant's gross income. However, a thorough review of appellant's federal tax returns appears to support appellant's argument that proceeds from the sale of investment property received as capital gains were not a regular or recurring part of his income.

{¶ 37} In 2007, appellant reported total capital gains of $1,538,202. More than 75 percent of those capital gains resulted from the sale of business property reported on Form 4797 of appellant's 2007 federal tax return. On that form, the property was described as investment condominiums in Pennsylvania; the property was sold for $2,208,600 and resulted in capital gains of $1,210,270. In 2007, appellant also reported

---

[3] In her brief, appellee makes assertions regarding capital gains reported on appellant's 2006 federal tax return. However, as noted above, appellant's 2006 federal tax return could not be located in the record filed with this court. Therefore, our review does not include appellant's 2006 federal tax return.

capital gains of $244,776 from transactions through UBS investment accounts, along with other gains and losses.

{¶ 38} In 2008, appellant reported capital losses of $1,500, although the actual losses calculated on Schedule D of his federal tax return were $128,555. The majority of appellant's capital losses in 2008 were due to investment activity through UBS investment accounts, a total reported loss of $254,298. Appellant reported a gain of $120,581 from the sale of business property in 2008, as reported on his Form 4797.

{¶ 39} Similarly, in 2009, appellant reported capital losses of $1,500, while his actual losses calculated under Schedule D were $368,974. Appellant's capital losses were based on losses of $251,882 on investment transactions through UBS accounts and carryover losses from the prior year of $127,012. Appellant did not claim any gain or loss from the sale of business property on Form 4797 in 2009.

{¶ 40} In the context of the three-year period the trial court examined, it is clear that appellant had activity resulting in capital gains or losses every year with respect to the UBS investment accounts. Thus, it was proper for the trial court to include in general any capital gains or losses from such investment activity in considering his gross income. However, it appears that appellant did not receive capital gains from the sale of business property on a regular basis. Reviewing appellant's tax returns for the decade prior to the parties' divorce indicates that capital gains from the sale of business property were an inconsistent source of his income. Appellant reported gains and losses from stock investments and transactions each year during this period. However, he only reported substantial capital gains from the sale of business property in two years other than 2007. In 2001, appellant reported a capital gain of $1,517,961 from the sale of property owned by Colt's Run Development, LLC.   In 2005, appellant reported a capital gain of $250,860 from the sale of a property called "Robinwood." Thus, appellant's tax returns demonstrate that capital gains from the sale of business property were not a regular part of his income.

{¶ 41} Appellee argues that capital gains from the sale of business property should be included in appellant's gross income because he is in the real estate business. Appellee cites *Conrad v. Conrad*, 7th Dist. No. 06-MA-128, 2007-Ohio-3186, and *Karis v. Karis*, 9th Dist. No. 2380, 2007-Ohio-759, in support of this argument. *Karis* involved the question of whether capital gains should be considered income for purposes of calculating

spousal support under R.C. 3105.18; therefore, we conclude that the *Karis* decision's citation of *Conrad* and discussion of capital gains in the context of calculating child support was dictum. *See Karis* at ¶ 11-12.

{¶ 42} In *Conrad*, the trial court included the father's capital gains from the sale of realty and stock investments as part of his gross income for purposes of calculating child support. *Conrad* at ¶ 6. The father appealed, arguing that the trial court erred by including capital gains from the sale of real estate because it was nonrecurring income. *Id.* at ¶ 12. There was evidence that the father was a self-employed property manager, with approximately eighteen properties in three states. *Id.* at ¶ 22-23. The father testified regarding the sale of several properties during the two-year period prior to the parties' divorce. After two of these sales, the father took the proceeds as a profit or used the proceeds to pay bills; following another sale, the father reinvested the proceeds through a "1031 exchange" to acquire another property.[4] *Id.* at ¶ 23. The court of appeals found that there was evidence to support the trial court's determination that the father was in the business of buying and selling real estate and that his sale of realty "occurred in the *ordinary course* of business." (Emphasis added.) *Id.* at ¶ 36. Because there was evidence to support the conclusion that the father was in the business of buying and selling real estate, the appellate court concluded that it was reasonable for the court to include capital gains from the sale of real estate in calculating the father's income for purpose of determining child support. *Id.* at ¶ 38. However, the appellate court also expressly stated that its opinion was limited to the facts of that particular case, noting that, "[i]f the evidence did not indicate that [the father] derived his income from the buying and selling of real estate then it would seem clear that capital gains from the sale of one parcel of property by [the father] would be a nonrecurring event not subject to inclusion as income for child support computation purposes." *Id.* at ¶ 38. We do not disagree that it would be reasonable to consider capital gains from the sale of real estate where a party is involved in the business of buying and selling real estate. However, the question of whether any such capital gains constitute recurring income must still be made on a case-by-case basis.

---

[4] "As an expert witness explained, a § 1031 exchange occurs '[w]here you have like-kind property. It's a tax deferral method of taking the property of A and transferring it for B. You get to swap. You get a new property and you don't have to pay taxes. The taxes are deferred.' (Tr. Vol.I, 141.)" *Wolf-Sabatino I* at ¶ 32.

{¶ 43} In this case, there was evidence that appellant's business involved purchasing and developing residential and commercial real estate. *Wolf-Sabatino I* at ¶ 3. Appellant testified that his companies were involved in construction and development of houses and condominiums, as well as commercial buildings and apartment communities. Appellant also testified that his companies provided property management services. There was evidence at trial regarding "1031 exchanges" of property conducted by appellant's companies, generally in the context of tracing marital versus separate assets. Although we agree that there are similarities between this case and *Conrad*, a review of the evidence in this case suggests that the capital gains from the sale of business property were nonrecurring. In *Conrad*, the magistrate focused on the tax data for a single year. In this case, the trial court averaged appellant's income over three years. In two of the three years the trial court examined, appellant had little or no capital gains from the sale of business property. Further, in this case, the trial court had access to the appellant's tax returns for the parties' entire marriage and could engage in a thorough review of appellant's income history. As explained above, even a limited review of appellant's tax returns for the decade prior to the divorce suggests that capital gains from the sale of business property were, at best, an infrequent and irregular component of appellant's income. While appellant is engaged in the buying and selling of real estate as part of his business, it appears that the proceeds from these sales are frequently reinvested in appellant's businesses or used to acquire additional property through 1031 exchanges. Thus, in this particular case, considering the multiple years of evidence, the receipt of capital gains from the sale of business property did not occur in the ordinary course of appellant's business. Because capital gains from the sale of business property were a nonrecurring cash flow item, the trial court abused its discretion by including them in its actual calculation of appellant's income.

{¶ 44} Finally, appellant argues that the trial court erred by failing to deduct business losses from the various "C" corporations in which he is a shareholder. He asserts that, because the trial court included business income he received from "S" corporations and partnerships, it was arbitrary to exclude the losses from his C corporations during the period between 2007 and 2009. Appellant argues that all of his business entities are treated the same for business purposes and that he uses a central bank account for all his

businesses from which the assets of one entity may be used to cover expenses for another. However, appellant fails to point out any specific business losses from C corporations that should have been considered in calculating his personal income. Rather, appellant argues that the more appropriate approach would be for the trial court to disregard income or losses from all his business entities and, instead, focus on his wages, investment interest income, and dividend income. It was appropriate for the trial court to consider appellant's personal tax returns, which include income and losses from some of his business entities, as a starting point for calculating his income. Absent any evidence demonstrating that certain losses from C corporations in which appellant was a shareholder should have been included in his gross income, we cannot conclude that the trial court abused its discretion by failing to include such losses in its calculation.

{¶ 45} Accordingly, we sustain in part and overrule in part appellant's first assignment of error.

## IV. Failure to Consider Deviation Factors

{¶ 46} Appellant's third assignment of error asserts that the trial court erred by failing to consider certain statutory deviation factors in calculating his child support obligation. Specifically, appellant claims that the trial court failed to consider his payments for the child's medical insurance and private school tuition, as well as the child's assets, and appellant's parenting time under the shared parenting plan.

{¶ 47} Under R.C. 3119.22, the trial court may order an amount of child support different from that calculated under the child support schedule and worksheet if, after considering the factors set forth in section 3119.23 of the Revised Code, "the court determines that the amount calculated pursuant to the basic child support schedule and the applicable worksheet * * * would be unjust or inappropriate and would not be in the best interest of the child." If the court determines that the calculated amount of child support would be unjust or inappropriate and would not be in the best interest of the child, it must enter findings of fact supporting that determination. R.C. 3119.22. One of the factors that may be considered is extended parenting time or extraordinary costs associated with parenting time. R.C. 3119.23(D). The court may also consider "significant in-kind contributions from a parent, including, but not limited to, direct payment for

lessons, sports equipment, schooling, or clothing." R.C. 3119.23(J). The court may also consider the child's financial resources and earning ability. R.C. 3119.23(F).

{¶ 48} As explained above, this is a case where the combined income of the parents exceeds $150,000 and, therefore, the trial court was required to make a case-by-case analysis to determine the appropriate amount of child support. This court has previously determined that, in cases where the parents' combined income exceeds $150,000, the trial court may consider the deviation factors provided in R.C. 3119.23 as part of its case-by-case analysis but is not required to consider those factors. *Wolfe v. Wolfe*, 10th Dist. No. 04AP-409, 2005-Ohio-2331, ¶ 28; *Galloway v. Khan*, 10th Dist. No. 06AP-140, 2006-Ohio-6637, ¶ 45. In *Wolfe*, the trial court found that the amount of child support calculated under the guideline standards was unjust, inappropriate, and not in the best interest of the children, due in part to an increase in the children's expenses following the divorce, the father's failure to exercise significant parenting time, and the significant disparity between the parents' incomes. *Wolfe* at ¶ 3. As a result, the trial court increased the father's child support obligation beyond the level calculated under the child support guidelines. *Id.* On appeal, the father argued that the deviation factors under R.C. 3119.23 did not apply in cases involving combined incomes of greater than $150,000 and that, because the trial court considered these factors, it failed to make a case-by-case analysis. *Id.* at ¶ 26-27. This court rejected the father's argument, concluding that "[i]t is not an abuse of discretion to consider the R.C. 3119.23 factors if the trial court computes the child support obligation on a case-by-case basis in accordance with R.C. 3119.04(B)." *Id.* at ¶ 29. Similarly, in *Galloway*, the trial court concluded that the guideline child support amount was not in the best interest of the children and ordered an increase in the amount of support. *Galloway* at ¶ 46. Citing *Wolfe*, this court rejected the father's argument that the trial court erred by considering the deviation factors and increasing his child support obligation. *Id.* at ¶ 45-46.

{¶ 49} Appellant argues that, under the shared parenting plan submitted by the parties, the child has five overnight stays with him out of every fourteen days during the school year, and summer parenting time is equally divided between appellant and appellee. Appellant asserts that the trial court failed to consider this parenting time schedule when determining his child support obligation. Appellant also argues that the

child has significant assets of his own, including an irrevocable trust created by appellant that was valued at more than $3.9 million in 2009. Appellant claims that he has invested in a 529 plan,[5] stocks and bonds, and a certificate of deposit for the child's benefit. Finally, appellant notes that, under the trial court's order, he is responsible for substantial additional expenses, including the child's private school tuition and all costs of any extraordinary medical expenses. Appellant argues that the trial court erred by failing to consider these expenses in calculating his child support obligation.

{¶ 50} The facts in the present appeal present the opposite scenario from that in *Wolfe* and *Galloway*. In this case, the trial court appears not to have considered the deviation factors under R.C. 3119.23 in determining appellant's child support obligation. When the parents' combined income exceeds $150,000, the trial court is not specifically required to consider the factors under R.C. 3119.23 in determining the appropriate child support obligation. *Wolfe* at ¶ 28. Accordingly, we hold that the trial court did not abuse its discretion by failing to consider those factors.

{¶ 51} Although we conclude that failure to consider the R.C. 3119.23 factors was not an abuse of discretion, due to our disposition of appellant's first and second assignments of error, we are remanding the order for a recalculation of appellant's child support obligation. In our prior decision in *Wolf-Sabatino I*, this court referred to the portion of the trial court's order requiring appellant to pay for the child's medical insurance and private school tuition and stated that "[t]he court, upon remand, *may* consider those expenses in adjusting the child support order." (Emphasis added.) *Wolf-Sabatino I* at ¶ 99. Consistent with this language and our prior decisions in *Wolfe* and *Galloway*, we further note that, on remand, the trial court may consider appellant's medical insurance and private school tuition obligations, in addition to other deviation factors under R.C. 3119.23, as part of its case-by-case analysis to determine appellant's child support obligation.

{¶ 52} Accordingly, we overrule appellant's third assignment of error.

---

[5] "529 Plans, also known as 529 College Savings Accounts, are so named because they are permitted under Section 529 of the Internal Revenue Code, 26 U.S.C. 529." *Albers v. Albers*, 2d Dist. No. 2012 CA 41, 2013-Ohio-2352, fn. 4.

**V. Claim that Support Orders Exceed Appellant's Monthly Salary**

{¶ 53} In his fourth assignment of error, appellant asserts that the trial court erred by ordering him to pay a combined amount of child support and spousal support that exceeds his monthly salary. Appellant claims that he lacks funds to meet these support obligations and will be in contempt for failure to comply with the order. Given our disposition of the first and second assignments of error, and the necessity of remanding this matter for a recalculation of appellant's child support obligation, appellant's fourth assignment of error is rendered moot.

**VI. Conclusion**

{¶ 54} Having overruled in part and sustained in part appellant's first assignment of error, sustained appellant's second assignment of error, overruled appellant's third assignment of error, and found moot appellant's fourth assignment of error, we reverse the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, and remand the matter to that court for further proceedings in accordance with law and consistent with this decision. On remand, the trial court will need to consider the gross income of the parties based on the statutory definition and the evidence presented and determine the appropriate amount of child support. If the parties' combined gross income exceeds $150,000, the trial court must conduct a case-by-case analysis of the needs and lifestyle of the child and the parents to determine the appropriate amount of child support.

*Judgment reversed; cause remanded with instructions.*

BROWN and CONNOR, JJ., concur.

_____