[Cite as *DeGrant v. DeGrant*, 2020-Ohio-70.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# GEAUGA COUNTY, OHIO

| | | |
|---|---|---|
| JENNIFER DEGRANT, | : | **O P I N I O N** |
| Plaintiff-Appellant, | : | |
| - vs - | : | **CASE NOS.  2019-G-0190** |
| | | **2019-G-0216** |
| MARK DEGRANT, et al., | : | |
| Defendant-Appellee. | : | |

Civil Appeals from the Geauga County Court of Common Pleas, Case No. 2015 DC 000999.

Judgment: Affirmed in part, reversed in part, and remanded.

*Joseph G. Stafford* and *Nicole A. Cruz*, Stafford Law Co., LPA, 55 Erieview Plaza, 5th Floor, Cleveland, OH 44114 (For Plaintiff-Appellant).

*Alan H. Kraus*, 20133 Farnsleigh Road, Shaker Heights, OH 44122 (For Defendant-Appellee).

MATT LYNCH, J.

{¶1}    Plaintiff-appellant, Jennifer DeGrant, appeals the Judgments of the Geauga County Court of Common Pleas, whereby the court issued a Decree of Divorce between her and defendant-appellee, Mark DeGrant, with respect to the issues of child custody, child support, spousal support, the division of marital property, and attorney fees, and whereby the court denied her Motion for New Trial.  For the following reasons, we affirm in part the decision of the court below, reverse in part, and remand for further proceedings consistent with this Opinion.

{¶2} On December 29, 2015. Jennifer filed a Complaint for Divorce with Motion for ex parte Temporary Restraining Order against Mark and TD Ameritrade, where it was averred the parties "maintain an account * * * which contains stocks, mutual funds, bonds and cash, the exact nature of which account is unknown to Plaintiff."

{¶3} On February 1, 2016, TD Ameritrade filed an Answer.

{¶4} On February 16, 2016, Mark filed an Answer and Counterclaim for Divorce, to which Jennifer replied on February 25, 2016.

{¶5} Trial was held before a magistrate on the following dates: October 31, 2017; November 1, 2017; January 3-5, 2018; January 8, 2018; January 18, 2018; January 22-23, 2018; January 26, 2018; January 31, 2018; February 1, 2018; February 9, 2018; and February 12-13, 2018.

{¶6} On June 25, 2018, a Magistrate's Decision was issued with Findings of Fact and Conclusions of Law. The magistrate made the following relevant findings and conclusions:

> 1. The parties [Mark, age 58, and Jennifer, age 42] were married on June 22, 2007, in Mayfield Hts., Ohio in a civil ceremony.
>
> * * *
>
> 2. One child was born as issue of the marriage, [R.D.] * * *, born December 1, 2011.
>
> * * *
>
> 11. "During the marriage" means July 22 [sic], 2007, to October 31, 2017. See R.C. 3105.171(A)(2).
>
> 12. Each party is entitled to a divorce from the other on the grounds of living separate and apart for over one year. See R.C. 3105.01.
>
> * * *

2

14.     Prior to filing for divorce, Plaintiff obtained an ex parte domestic violence civil protection order ("DV CPO") December 3, 201[5], naming Plaintiff and [R.D.] as protected parties and vacating Defendant from the marital residence.

15.     After issuance of the ex parte order, Defendant did not see the child until a Magistrate Order, filed February 19, 2016, modified the ex parte CPO permitting Defendant to have supervised visitation.

16.     Plaintiff dismissed the DV CPO on July 26, 2016.

17.     On July 26, 2016, an Agreed Temporary Protection Order was filed in this case incorporating the terms of the modified DV CPO, including no contact between the parties.

* * *

70.     After consideration of factors in R.C. 3109.04(F)(2), this court finds Defendant's proposed shared parenting plan is in the best interest of the child.

* * *

80.     Plaintiff has not been employed since January 2007, approximately six months before the parties' marriage.

* * *

85.     Defendant has not been employed since 2006, approximately one year before the parties' marriage.

* * *

92.     Plaintiff is voluntarily unemployed.  Plaintiff is capable of earning at least $37,000 per year.

93.     For purposes of child support, Plaintiff is imputed annual income of $37,000.00.

94.     Defendant is voluntarily unemployed.  Defendant is capable of earning at least $45,000 per year.

95.     For purposes of child support, Defendant is imputed annual income of $45,000.00.

3

96.    It is in the child's best interest for Defendant to pay child support to Plaintiff, in the sum of $545.62 per month, plus 2% processing fee.  *See* R.C. 3119.23.

* * *

102.    The parties have a joint checking account (5073) at Chase Bank.

103.    Plaintiff has: (1) Citibank checking account (6865); and (2) Citibank savings account (4418).

104.    Defendant has: (1) Chase checking account (5065); (2) Chase savings account (8934); (3) Bank of America checking account (0818); and (4) Bank of America Money Market account (4297).

105.    Defendant opened his Bank of America checking and money market accounts prior to marriage.

106.    Defendant has a TD Ameritrade investment account (3460).

107.    Neither party testified to any current account balances.

108.    Neither party had access to the other parties' accounts.

* * *

124.    On July 27, 1993, Defendant purchased a residence at 8146 Boss Street, Vienna VA.  The property was unencumbered by a mortgage.  The residence was sold on May 31, 2009, resulting in net proceeds of $583,865.  The net proceeds were deposited into Defendant's TD Ameritrade account.

125.    On April 28, 2006, Defendant purchased a residence at 809 Elden Street, Herndon VA for $1,080,146 (adjusted purchase price), subject to a mortgage of $600,000.  Defendant refinanced the mortgage once; Plaintiff had no part in the refinance.  Plaintiff and Defendant resided in the house until its sale on October 21, 2010.  The sale resulted in net proceeds of $161,978.

126.    Prior to marriage, Plaintiff owned a townhouse on Fontwell Drive, Sterling, Virginia.  The property was encumbered by a mortgage.  Plaintiff did not testify to the amount of the mortgage.

* * *

4

130.     Plaintiff testified the townhouse sold for "tens of thousands of dollars" in 2013 or 2014.  No evidence was provided of the amount or disposition of sale proceeds.

131.     On October 27, 2012[1], the parties purchased the residence at 107 Ashleigh Drive[, Chagrin Falls, Ohio,] for $1,010,000.00.  A down payment of $333,978 was made on the property from the following sources: a) $161,978 from net proceeds of the sale of the Herndon property; b) $172,000 from Defendant's TD Ameritrade account.

* * *

166.     The parties' joint Chase account should be equally divided and closed.

167.     Each party should retain the bank accounts in his or her own name.

168.     Plaintiff should retain her TD Ameritrade IRA [a rollover from her former employer].  See R.C. 3105.171(A)(6)(a)(ii).

169.     Defendant should retain his T Rowe Price IRA [a rollover 401k retirement account], Fidelity IRA [a rollover 401k retirement account], and TD Ameritrade IRA [premarital].  See R.C. 3105.171(A)(6)(a)(ii).

170.     Plaintiff should receive 8.2% of Defendant's TD Ameritrade investment account (3460) within 30 days of journalization of the Judgment Entry.  See R.C. 3105.171(A)(3).

171.     The [Ashleigh] house should be immediately listed for sale with Adam Kaufman of Howard Hanna Realty.

* * *

180.     Plaintiff should receive 5.81% of net proceeds from the sale of the marital residence and Defendant should receive the balance of net proceeds.  See R.C. 3105.171(A)(3).

* * *

189.     Plaintiff has a Citi credit card with a balance close to $31,000 as of January 22, 2018.

---

1.  The evidence in the record is that the Ashleigh Drive property was purchased in 2010.  In 2012, an empty lot was purchased on Ashleigh drive as indicated in paragraph 135 of the Magistrate's Decision.

\* \* \*

200.    Each party should pay credit card debt in their own names.

201.    Plaintiff drives an unencumbered Porsche Cayenne purchased during the marriage. Defendant testified the vehicle's value is $22,000. Defendant stipulated the vehicle is a marital asset.

202.    Defendant drives an unencumbered Jeep, valued at $4,000. Defendant stipulated the vehicle is a marital asset.

203.    Each party should retain the vehicle in his or her possession. *See* R.C. 3105.171(A)(3)(a)(i).

\* \* \*

205.    Plaintiff should pay Defendant $9,000 within 30 days of journalization of the Judgment to equalize the value of the vehicles.

206.    Defendant brought into the marriage antique weapons, coins, collectibles and furniture.

207.    Plaintiff brought furniture into the marriage.

\* \* \*

214.    Each party should retain all property acquired by each prior to marriage. *See* R.C. 3105.171(A)(6)(a)(ii).

\* \* \*

216.    The parties agreed to divide household furnishings acquired during the marriage.

\* \* \*

218.    Neither party should pay spousal support to the other. The court should not retain jurisdiction over the issue.

\* \* \*

232.    [Attorney] Sotera accrued 711.80 hours representing Plaintiff, for a total of $213,540.

\* \* \*

238.     During the pendency of the matter, Defendant advanced $37,500 in attorney fees to Plaintiff.  Of those fees, $7,500 was a cash distribution made pursuant to [a] February 10, 2016 Magistrate Order.

* * *

251.     Each party should pay the balance of their own attorney fees.

{¶7}    On July 9, 2018, Jennifer filed Preliminary Objections to Magistrate's June 25, 2018 Decision and Motion to Supplement upon Completion of Transcript.  Mark filed a Response on July 18, 2018.

{¶8}    On December 17, 2018, Jennifer filed Supplemental Objections to the Magistrate's Decision Issued June 25, 2018.  Mark filed a Response on December 26, 2018.

{¶9}    On December 31, 2018, the trial court issued its Judgment and, finding no error of law or other defect in the Magistrate's Decision, adopted it without modification.

{¶10}   On January 22, 2019, Jennifer filed a Motion for New Trial.  Mark filed a Brief in Opposition on February 5, 2019.  Jennifer filed a Reply on February 15, 2019.

{¶11}   On January 25, 2019, Jennifer filed a Notice of Appeal, denominated Appeal No. 2019-G-0190.

{¶12}   On March 7, 2019, this court remanded the case "for the sole purpose of the trial court ruling on the January 22, 2019 motion for new trial."

{¶13}   On June 6, 2019, the trial court issued its Judgment, denying the Motion for New Trial.

{¶14}   On June 21, 2019, Jennifer filed another Notice of Appeal, denominated Appeal No. 2019-G-0216.  This court consolidated the two appeals on July 22, 2019.

{¶15}   On appeal, Jennifer raises the following assignments of error:

7

{¶16} "[1.] The trial court erred as a matter of law and abused its discretion by excluding the testimony of Janet Davis, Ph.D. (child therapist), and Sheryl Flanagan (visitation supervisor) and Lynn Behrman."

{¶17} "[2.] The trial court erred as a matter of law and abused its discretion in its allocation of parental rights and responsibilities and by ordering shared parenting."

{¶18} "[3.] The trial court erred as a matter of law and abused its discretion in its division of property, and the trial court's determination of separate and marital property is not supported by the manifest weight of the evidence."

{¶19} "[4.] The trial court abused its discretion in its determination of income, and its failure to award spousal support constitutes an abuse of discretion."

{¶20} "[5.] The trial court failed to properly calculate M.D.'s income for support purposes resulting in an improper child support order which is not in the best interest of the parties' minor child."

{¶21} "[6.] The trial court erred by failing to grant J.D. a reasonable award of attorney fees and litigation expenses incurred in this matter."

{¶22} "[7.] The trial court erred as a matter of law by disregarding the mandates of Civ.R. 75(N) and Civ.R. 53."

{¶23} "[8.] The appellant has demonstrated that she is entitled to a new trial under Civil Rule 59, and the trial court's denial of the motion for new trial is an abuse of discretion."

{¶24} The standard of review generally applicable to a trial court's adoption of a magistrate's decision is abuse of discretion. *Mandzuch v. Affordable Reasonable Rentals, LLC*, 11th Dist. Geauga No. 2018-G-0179, 2019-Ohio-2092, ¶ 35. The

8

application of this standard in particular contexts, such as evidentiary and custodial determinations, will be noted as appropriate throughout this Opinion.

{¶25} In the first assignment of error, Jennifer challenges the trial court's rulings to exclude the testimony and/or evidence of certain witnesses: Dr. Janet Davis, Sheryl Flanagan, and Lynn Behrman.

{¶26} Relevant evidence, defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," is admissible at trial. Evid.R. 401 and 402. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B).

{¶27} "The trial court has broad discretion in the admission and exclusion of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere." *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967); *State ex rel. DeWine v. Deer Lake Mobile Park, Inc.*, 2015-Ohio-1060, 29 N.E.3d 35, ¶ 66 (11th Dist.).

{¶28} Additionally, "[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Civ.R. 61. "In reviewing whether a substantial right of a party has been affected, the reviewing court must decide whether the trier of fact would have reached the same decision had the error not occurred." *Berger v. Berger*, 2015-Ohio-5519, 57 N.E.3d 166, ¶ 9 (11th Dist.).

{¶29} When making a determination regarding the allocation of parental rights and

9

responsibilities, "the court shall consider all relevant factors, including, * * * [t]he child's interaction and interrelationship with the child's parents, * * * [t]he child's adjustment to the child's home, school, and community [and] * * * [t]he mental and physical health of all persons involved in the situation."  R.C. 3109.04(F)(1)(c), (d), and (e).

{¶30}  Dr. Davis was R.D.'s therapist.  On October 31, 2017, the first day of trial, Jennifer issued a subpoena to Davis to testify at trial.  On November 1, 2017, the magistrate ruled that she was "disinclined" to have Davis testify "as she is the—a therapist for the minor child."  Jennifer made a proffer that Davis would have "provided the trial court with information concerning the child's regressions, the child's adjustment to the divorce, Dr. Davis's interactions with [Jennifer and Mark], and Dr. Neuhaus and would have described what attempts she made to meet with [Mark] and the minor child to help work on their relationship."  Appellant's brief at 7.

{¶31}  In ruling on Jennifer's Motion for New Trial, the trial court noted that communications between Dr. Davis and R.D. are privileged under R.C. 4732.19 and that "Dr. Davis reported on her counseling sessions with R.D. and her conversations with R.D.'s father to Dr. Neuhaus which were again considered by him in his reports."

{¶32}  We note that the communications between Dr. Davis and R.D. are privileged and that this privilege has been upheld by the courts.  *See Barry v. Barry*, 169 Ohio App.3d 129, 2006-Ohio-5008, 862 N.E.2d 143, ¶ 20-25 (8th Dist.).  In the present case, that privilege was compromised by the trial court's appointed expert, Dr. Steven Neuhaus, who consulted with Davis in the preparation of his report and recommendation submitted to the court.  Both in the written report and in his trial testimony, Neuhaus provided detailed accounts of his consultations with Davis regarding the custody issue.

10

Neuhaus reported Davis' own impressions and concerns regarding R.D. and his interactions with his parents.

{¶33} "With respect to matters of custody and visitation, the central focus * * * is * * * the best interests of the children." *Kelm v Kelm*, 92 Ohio St.3d 223, 226, 749 N.E.2d 299 (2001), citing R.C. 3109.04(B)(1). While it is the child's best interest which must guide the trial court's ultimate determination, divorce remains an adversarial proceeding in which each party is entitled to advocate and present evidence as to what that party believes is in the child's best interest. *Wourms v. Wourms*, 166 Ohio App.3d 519, 2006-Ohio-1968, 851 N.E.2d 553, ¶ 33 (2d Dist.) ("divorce * * * is an adversarial proceeding in which the parties are expected to protect their own interests"); *Rochow v. Rochow*, 7th Dist. Mahoning No. 94 C.A. 49, 1996 WL 227763, *2-3 (recognizing that "a divorce proceeding is adversarial by nature" and that the trial court "erred in refusing to allow appellant to present evidence concerning the allocation of parental rights and responsibilities"). Here, Dr. Davis unquestionably had relevant testimony to give regarding R.D.'s best interests. The magistrate could not simply exclude that testimony in preference to her own witness, Dr. Neuhaus, particularly in light of the fact that he testified regarding his consultations with Davis and to what her concerns were as to R.D.'s custody.

{¶34} It has been recognized that, in custody matters, trial courts are "not bound by strict legal rules of evidence and could consider reports of court-appointed investigators and the hearsay evidence contained therein as long as their decisions were not based entirely thereon." *Corrigan v. Corrigan*, 4th Dist. Ross No. 1300, 1986 WL 15205, *5. "[T]he parties are afforded sufficient due process protection by virtue of the

11

right to cross-examine the court-appointed investigator." *Id.* at *6; *In re R.J.E.*, 11th Dist. Portage No. 2016-P-0025, 2017-Ohio-886, ¶ 43 ("a GAL report can be considered by the trial court, despite any hearsay contained in the report, so long as the trial court provides protection of the parties' due process rights") (citation omitted); *Allison v. McCune*, 2016-Ohio-7936, 75 N.E.3d 676, ¶ 66 (7th Dist.) ("[g]iven the guardian's role and the requirements that she explain her investigation and the basis for her recommendation, her report and testimony may necessarily include information about what other people told her") (citation omitted).

{¶35} In the present case, the magistrate did not rely exclusively on Dr. Neuhaus' testimony, but it did so to such an overwhelming degree as to prejudice Jennifer in the presentation of her case. Neuhaus testified for three full days at trial. The majority of this testimony was opinion testimony, inasmuch as he was not competent to offer factual testimony or provide "evidence of 'facts' about which he [had] no first-hand knowledge." *Allison* at ¶ 67. The only other witness to testify as to custodial matters (apart from Jennifer and Mark) was a visitation supervisor. The trial court expressly noted Dr. Davis' sessions and/or conversations would have been "considered by [Neuhaus] in his reports." As indicated above, this is insufficient justification to exclude Davis as a witness inasmuch as Neuhaus' interests are not Jennifer's interests. Moreover, Neuhaus' observations of R.D. were by his own admission limited in comparison to Davis' interactions with the child. Accordingly, the lower court committed reversible error by excluding Davis as a witness.

{¶36} During the pendency of this divorce action, Mark had only supervised visitation with R.D. and Flanagan was one of the visitation supervisors. She testified at trial on January 3 and 23, 2018. She documented the visits between Mark and R.D. by

writing summaries of the visitation and making video recordings with her cell phone. Mark objected to her testifying. Jennifer argued that Flanagan would provide "information that this court needs in order to determine what is in R.D.'s best interest." Jennifer further represented: "If [Flanagan] has opinions that the court doesn't want to listen to, the court won't listen to them and I'm not asking her to give opinions. I'm asking her to provide us the facts about what has occurred during her time being involved with R.D. and his father." Flanagan was allowed to testify and consult her visitation summaries although these were not admitted into evidence. Certain videos were also shown to the court. On January 4, 2018, Jennifer made a proffer to the court that Flanagan was not able to testify as to her opinions and concerns formed from her observations during visitation although this apparently contradicted her representation on the day before.

{¶37} In ruling on Jennifer's Motion for New Trial, the trial court noted: "[T]here was thorough testimony by others concerning Ms. Flanagan's visits and observations. Her visit summaries and videos were provided to the court appointed custody evaluator, Dr. Neuhaus and considered by him in his reports. Thus, to some extent such testimony would have been repetitive and her observations and opinions had already been utilized by Dr. Neuhaus who testified at great length."

{¶38} The trial court's ruling is sound. Flanagan's concerns that Mark did not act appropriately around R.D. were evident from her trial testimony and reflected in Neuhaus' report and testimony. There was no need for Flanagan to repeat those concerns which, in fact, were more in the nature of conclusions drawn from what she had observed. The incidents and observations on which such concerns were based were testified to at length. Despite the proffer on January 4, Jennifer represented to the magistrate on

13

January 3 that she was "not asking her to give opinions." We find no abuse of discretion in the exclusion of the written summaries and the limiting of Flanagan's testimony to what she observed.

{¶39} Behrman was another visitation supervisor. She was not called by either party to testify at trial. During the time that Behrman was supervising visitation, Mark took R.D. into a hot tub at a fitness center. Jennifer testified that it caused R.D. to have "burns on his face" and a "rash on his behind." A pediatrician's visit summary prescribed Eucerin for rash but did not indicate a burn injury. Neuhaus acknowledged that the incident raised concerns as to "how the hot tub affected his skin." Mark testified that R.D. enjoyed the warm water without apparent injury or trauma. Jennifer advised the court that she wanted to impeach Mark's testimony with written summaries of the visitation prepared by Behrman or, in the alternative, to call Behrman as a rebuttal witness. The magistrate refused, noting that the hot tub incident had been addressed "thoroughly, exhaustively," and that she was "unhappy" that this was coming up "at the end of numerous days of trial."

{¶40} In ruling on Jennifer's Motion for New Trial, the trial court noted that "Behrman's reports were provided to Dr. Neuhaus and considered in his reports."

{¶41} Although a party unquestionably has the right to present rebuttal witnesses, *Phung v. Waste Mtg., Inc.*, 71 Ohio St.3d 408, 410, 644 N.E.2d 286 (1994), the rejection of Behrman was not materially prejudicial. Although Jennifer claims Mark mischaracterized the incident, the proffered visitation reports do not materially contradict Mark's account of the incident but rather corroborate the testimony that R.D. enjoyed the warm water.

14

{¶42} With respect to the exclusion of Dr. Davis as a witness, the first assignment of error is with merit.

{¶43} In the second assignment of error, Jennifer argues the trial court erred by adopting Mark's shared parenting plan.

{¶44} "Either parent or both parents of any children may file a pleading or motion with the court requesting the court to grant both parents shared parental rights and responsibilities for the care of the children in a proceeding [pertaining to the allocation of parental rights and responsibilities for the care of a child]." R.C. 3109.04(G). "The approval of a plan * * * is discretionary with the court," and the court "shall not approve a plan * * * unless it determines that the plan is in the best interest of the children." R.C. 3109.04(D)(1)(b). This court has emphasized the trial court's broad discretion in determinations involving shared parenting, even stating that we are guided by the presumption that the court's findings in such matters are correct. *Brandt v. Brandt*, 11th Dist. Geauga No. 2012-G-3064, 2012-Ohio-5932, ¶ 11.

{¶45} With respect to the best interest factors set forth in R.C. 3109.04(F)(1), the magistrate found:

> (a) The wishes of the child's parents regarding the child's care; Plaintiff requested she be designated residential parent and legal custodian. Defendant requested shared parenting.
>
> (b) If the court interviewed the child in chambers * * * regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
> The child was not interviewed in chambers.
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
> [R.D.] spent most of his time with Plaintiff after the DV CPO was filed

15

in December 2015. Evidence reflects [R.D.] enjoys his visits with Defendant. [R.D.] has no siblings.

(d)     The child's adjustment to the child's home, school, and community;

[R.D.] attends St. Joan of Arc kindergarten in Chagrin Falls. [R.D.] is doing well in school. The school did not find [R.D.]'s behavior regressive. The marital residence is located in the Chagrin Falls School District. The residence will be sold and there is no evidence where the parties will reside after sale.

(e)     The mental and physical health of all persons involved in the situation;

Both parties appeared to be in good health. No evidence was presented regarding parents' mental health. [R.D.]'s behavior regressed after commencement of divorce proceedings.

(f)     The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

The parties have no direct communication with each other pursuant to court order. All communications are channeled through attorneys. Defendant testified he is willing to set aside differences for the sake of [R.D.]. Plaintiff did not testify she was willing to work with Defendant. Plaintiff repeatedly stated [R.D.] is in danger when with Defendant.

(g)     Whether either parent has failed to make all child support payments, including all arrearages that are required of that parent pursuant to a child support order under which that parent is an obligor;

There was no temporary order for child support. Pursuant to an Agreed Magistrate's Order, Defendant paid all reasonable and necessary expenses for the marital residence, insurances, maintenance, cell phones, Plaintiff's credit card bill and [R.D.]'s school tuition.

(h)     Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child;

Defendant was charged with domestic violence. No evidence was presented regarding injuries to Plaintiff or that Defendant violated a no contact order. No evidence was presented that [R.D.] was abused, injured or in danger of physical harm.

(i)     Whether the residential parent or one of the parents subject

16

to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
Plaintiff unilaterally stopped visitation on two occasions after learning of supervisor concerns.

(j)     Whether either parent had established a residence, or is planning to establish a residence, outside the state;
Neither party is planning to establish a residence outside the state.

{¶46} With respect to the best interest factors relative to shared parenting set forth in R.C. 3109.04(F)(2), the magistrate found:

(a)     The ability of the parents to cooperate and make decisions jointly, with respect to the children;
The parties have not communicated since the divorce was filed. Defendant testified he is willing to set aside differences for [R.D.] Plaintiff did not so testify.

(b)     The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;
Defendant testified he wants his child to be healthy and have two supportive parents. Plaintiff filed a DV CPO seeking protection for herself and [R.D.]. Later testimony revealed Defendant never harmed or threatened [R.D.]. Plaintiff unilaterally withheld visitation on two occasions during the pendency of this matter. Plaintiff's testimony about Defendant was unremittingly negative.

(c)     Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;
Plaintiff filed domestic violence charges against Defendant, with [R.D.] as a protected party. There is no evidence of abuse or violence against [R.D.] or Plaintiff.

(d)     The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting.
Currently, Plaintiff lives in South Russell and Defendant lives in Beachwood. This is a distance of about 15 miles.

(e)     The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem;
No guardian ad litem was appointed.

{¶47} Jennifer's primary contention on appeal is that the magistrate did not follow

17

the recommendation of the custody evaluator Neuhaus. Jennifer fairly summarizes Neuhaus' recommendation to be that "shared parenting is not appropriate, that [Mark] should continue with supervised visitation, that supervised visitation should phase out with the assistance of mental health professionals involved, and that [Jennifer] should be designated residential parent and have final decision-making authority regarding all major decisions for the minor child." Appellant's brief at 15.

{¶48} It is well-established that a trial court is not bound by an expert's recommendations regarding custody. *Delly v. Delly*, 11th Dist. Lake No. 2011-L-018, 2011-Ohio-6004, ¶ 40; *Ferrell v. Ferrell*, 7th Dist. Carroll No. 01-AP-0763, 2002-Ohio-3019, ¶ 43.

{¶49} The magistrate rejected Neuhaus' recommendation out of concerns that, "without shared parenting, Plaintiff will marginalize Defendant's role as [R.D.]'s father." This concern is amply supported by the record.

{¶50} The magistrate also stated that the "parties bear the responsibility of working together to raise their child, without third party intervention," particularly in light of the cost of such intervention. Mark testified that he has paid fees to Neuhaus in the amount of $30,364 and to various visitation supervisors in the amount of $20,345. Additional fees were paid to his therapist, Jennifer's therapist, and R.D.'s therapist. Neuhaus' recommendation would require the continued maintenance of these professionals for the foreseeable future. As the trial court pointed out in ruling on Jennifer's objections, "there is no evidence that the father had permitted injury or mishap to the child during his limited visitations though some supervisors thought father engaged in too rough and risky behaviors when playing with the child." Indeed, Neuhaus' concerns,

18

unlike those of Jennifer, are not that Mark places R.D. in any actual physical danger but are for the development of a healthy psychological dynamic between the parties and R.D. While certainly a desirable goal for any family, the more immediate need in the present case is for an effective allocation of parental rights and responsibilities. Neuhaus likewise recognized that prolonged litigation and the involvement of professionals produced its own psychological stress to the detriment of the parties' well-being. The adoption of the shared parenting plan to establish a degree of normality in the parties' relationships is neither contrary to R.D.'s interests nor an abuse of discretion.

{¶51} Additional argument has been raised regarding the manner in which the shared parenting plan was adopted. A trial court does not have authority to modify and adopt a shared parenting plan. If the court wishes to make changes to a plan submitted by one of the parties, the appropriate procedure is for the court to order a party to make the changes and resubmit the plan. *See* R.C. 3109.04(D)(1)(a)(iii) ("[i]f the court determines that no filed plan is in the best interest of the children, the court may order each parent to submit appropriate changes to the parent's plan or both of the filed plans to meet the court's objections or may select one filed plan and order each parent to submit appropriate changes to the selected plan to meet the court's objections"); *Robinette v. Robinette*, 8th Dist. Cuyahoga No. 88445, 2007-Ohio-2516, ¶ 8 ("the [shared parenting] statute does not authorize the court to create its own shared parenting plan" and, "if a satisfactory plan is not filed [by the parties], the court should not adopt any plan at all").

{¶52} In the present case, Mark filed a Motion for Shared Parenting on October 31, 2016.

{¶53} The magistrate found that "Defendant's proposed shared parenting plan is

19

in the best interest of the child" and attached a copy of the plan to her Magistrate's Decision. However, the magistrate made some modifications to the plan with respect to the time each party had custody of the child, the school the child would attend, and the manner in which the parties would communicate with each other. The magistrate then properly ordered that "Defendant should modify his Shared Parenting Plan to reflect these changes."

{¶54} Mark never submitted a modified shared parenting plan to the trial court.

{¶55} In its December 31, 2018 Judgment, the trial court adopted the Magistrate's Decision. In relevant part, the court held:

> **IT IS FURTHER ORDERED** that the Shared Parenting Plan, attached as Exhibit 1, be and is hereby ordered into effect.
>
> **IT IS FURTHER ORDERED** that Defendant has the child every Sunday from 7:00 pm to Tuesday at 7:00 pm; and Plaintiff has the child every Tuesday at 7:00 pm to Thursday at 7:00 pm.
>
> The parties shall alternate weekends from Thursday at 7:00 pm to Sunday at 7:00 pm.
>
> The parties shall mutually agree on a school for [R.D.]. If the parties cannot agree, [R.D.] shall attend public school in the district in which Defendant resides.
>
> All communication between the parties shall take place through Our Family Wizard ("OFW"). Defendant shall pay the cost for both parties to subscribe to OFW for the first year; thereafter each party should pay for their own subscription.

{¶56} The trial court's adoption and simultaneous modification of the shared parenting plan was contrary to the dictates of R.C. 3109.04(D)(1)(a)(iii). It has been held that the act of simultaneously adopting and modifying a shared parenting plan "rises to the level of plain error." *Holden v. Holden*, 12th Dist. Brown No. CA2015-07-016, 2016-Ohio-5557, ¶ 26 (cases cited).

20

{¶57} The second assignment of error has merit to the extent indicated above.

{¶58} In the third assignment of error, Jennifer contests the division of property and the determination of marital and separate property.

{¶59} "In divorce proceedings, the court shall * * * determine what constitutes marital property and what constitutes separate property. In either case, upon making such a determination, the court shall divide the marital and separate property equitably between the spouses, in accordance with this section." R.C. 3105.171(B). "Marital property" is defined as "[a]ll real and personal property that currently is owned by either or both of the spouses," or in which either or both spouses have an interest, and "that was acquired by either or both of the spouses during the marriage," as well as "all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage." R.C. 3105.171(A)(3)(a)(i)-(iii). "Separate property" is defined, in relevant part, as "all real and personal property and any interest in real or personal property that is found by the court to be * * * acquired by one spouse prior to the date of the marriage, or "[p]assive income and appreciation acquired from separate property by one spouse during the marriage." R.C. 3105.171(A)(6)(a)(ii) and (iii).

{¶60} "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b). "Traceability of an asset from its origin as a discrete, separate property to its current status is the primary means of determining whether the property is separate." (Citation omitted.) *Hatch v. Hatch*, 11th Dist. Lake No. 2018-L-094, 2019-Ohio-1414, ¶ 7.

21

{¶61} The principal testimony regarding the status of the parties' property in the present case was presented by Stanley J. Olejarski, CPA, on behalf of Jennifer, and John Davis, CPA, on behalf of Mark. The magistrate found Davis' testimony more credible than Olejarski's testimony. Initially, Jennifer argues that Davis was not qualified under Evidence Rule 702(C) ("[t]he witness' testimony is based on reliable scientific, technical, or other specialized information") to provide expert testimony as to the classification of marital and separate property. "Mr. Davis is not a lawyer or a judge, as such he does not have the requirements or training to make a legal conclusion as to the classification of separate property." Appellant's brief at 20.

{¶62} We find no error. "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Evid.R. 704. Davis was just as competent as Olejarski to opine regarding the marital or separate character of property as was Neuhaus to opine regarding the best interests of the child. Davis established his qualifications as an expert in the tracing of premarital assets and has been accepted as such in prior cases. In the present case, he was accepted without objection by Jennifer.

{¶63} Jennifer argues that, "[w]ith respect to the equity in the Ashleigh residence and other real estate properties, the trial court simply ignored the fact that [Mark] and his 'expert' Mr. Davis failed to adequately trace the equity and failed to submit evidence as to the value of the Herndon, Virginia residence on the date of the parties' marriage; evidence as to the mortgage on the Herndon residence on the date of marriage and/or evidence as to the decrease in the Herndon mortgage during the marriage." Appellant's brief at 22. These arguments have no support in the record before this court. It is

22

undisputed that Mark purchased the Herndon residence prior to the marriage with necessarily premarital assets for $1,080,146. During the period in which Mark was most active in trading stocks, i.e., in 2009, there was a reduction of $10,838 in the mortgage principal. Of this $10,838 reduction, 16.4 percent should be deemed marital inasmuch as the money used to reduce the principal came from the TD Ameritrade brokerage account and Davis had determined 16.4 percent of the funds generated by the brokerage account were marital. Thus, the marital portion of the equity in the Herndon house was $1,777 (16.4 percent of $10,838).

{¶64} The Ashleigh property was purchased for $1,010,000 in 2010. The down payment consisted of $161,978 from the sale of the Herndon home (of which $1,777 was marital) and $172,000 from the Ameritrade brokerage account (of which $28,208 was marital applying the 16.4 percent formula). The mortgaged amount of the purchase price was $707,000. As of April 2017, there had been a reduction in the mortgage principal of $183,493 of which 16.4 percent or $30,093 would be marital. While cumbersome, the traceability of the marital equity in the Herndon and Ashleigh properties is comprehensible. Davis further identified the documents (such as purchase agreements, HUD statements, and mortgage statements) on which his figures are based.

{¶65} Jennifer similarly challenges Davis' conclusions regarding the Ameritrade brokerage account, arguing rather broadly that the determination that this account was Mark's separate property is not supported by the evidence in light of the facts that "[t]he parties engaged in stock trading through the TD Ameritrade account as the sole means of supporting their upper-class lifestyle." Appellant's brief at 23. On the contrary, the facts that the parties engaged in stock "trading" (which may be defined to include simply

23

the selling or liquidating of stock) and supported their lifestyle by disbursements from the Ameritrade brokerage account does not undermine Davis' conclusion that only 16.4 percent of the account is marital. Davis set forth criteria for distinguishing between active and passive involvement in the stock market. Looking at Mark's activity for the years from 2007 to 2015, Davis concluded that Mark was only actively trading (as opposed to passively or opportunistically investing) in 2009. In support of this conclusion, it can be noted inter alia that the number of trades and the value of the stock traded in 2009 alone exceeded the number of trades and value of the stock traded in the other years between 2007 and 2015 combined. From the singular fact that only in 2009 were the gains from stock trading actively earned Davis extrapolated the 16.4 percent figure.

{¶66} Jennifer criticizes the magistrate for not distinguishing the income earned from the Ameritrade brokerage account "as capital gains, dividend or interest generated." If this failure was material to Davis' conclusions, there is no evidence of it in the record. The only evidence contrary to Davis' conclusions was Olejarski's testimony. His opinion was the following: "Regarding the nature of this [brokerage] account as marital or premarital, I noted no attempt to separate the premarital assets from the marital assets. In my opinion the assets were hopelessly comingled and the balance in this account can only be considered marital assets." Olejarski is not clear about the source of the purportedly marital funds in the brokerage account. The magistrate's decision to credit Davis' testimony over Olejarski's is supported by the evidence.

{¶67} Jennifer argues that the magistrate erred by excluding the testimony of David Rodriguez, a former loan officer at Chase Mortgage, who worked with the parties to obtain mortgage financing. In support of their loan applications, Mark wrote letters to

Chase Mortgage to explain his employment situation. Mark wrote that "trading is our livelihood" and "business" and that "equity trading [is] a very rewarding occupation for both of us." Moreover, this occupation requires him to analyze market conditions "on a daily basis" so as to take "advantage of market volatility." The letters were admitted into evidence. Jennifer further sought to have Rodriguez testify as a rebuttal witness on February 1, 2018. In a subsequent proffer, Jennifer represented that Rodriguez would have testified that "banks don't lend money to people who have solely passive income" and that Mark represented himself as a day trader.

{¶68} The magistrate properly excluded Rodriguez' testimony. In the first instance, Rodriguez' proffered testimony does not actually rebut anything testified to by Mark, who admitted writing the letters in order to convince the bank that he was employed and so be considered for a loan. Next, the letters themselves were introduced into evidence and there is no indication that any representations made by Mark directly to Rodriguez differed materially from what was contained in the letters. Regardless of what Mark represented to Rodriguez, his actual market activity is well attested by Davis' report. As the trial court concluded, Rodriguez' testimony would have been duplicative.

{¶69} Finally, Jennifer objects to the magistrate's finding that her credit card spending was "excessive and unreasonable" and that she should be responsible for the card's balance of $31,000.

{¶70} The magistrate found, consistent with credit card records admitted into evidence, that between November 2014 and July 2015, prior to the filing of the divorce, monthly credit card charges "ranged from $1,881 to $4,333." In 2016, after the filing for divorce, charges "ranged from $2,757 to $10,000" and total charges for the year were

25

$75,727 of which $38,092 was spent on merchandise. The magistrate also found that Mark paid the balance of the credit card in full until October 2016, when he began to only pay between $2,000 and $5,000 as he viewed Jennifer's increased spending as unreasonable. The magistrate agreed and accordingly assigned her the balance remaining on the credit card.

{¶71} Jennifer claims that the magistrate failed to identify specific unreasonable or excessive transactions but cites no authority for this proposition. At trial several individual transactions were discussed which, taken singularly, may not be unreasonable or excessive. In the aggregate, however, they could be found unreasonable and excessive. For example, a single restaurant charge might not be unreasonable whereas thirty restaurant charges in a month could be unreasonable. Assuming, arguendo, that the credit card debt incurred during the pendency of the divorce was entirely marital debt, by paying the full balance of the credit card through October 2016 and making partial payments thereafter Mark has paid well in excess of $30,000. There is no abuse of discretion in requiring Jennifer to pay the remaining balance.

{¶72} The third assignment of error is without merit.

{¶73} Under the fourth assignment of error, Jennifer challenges the magistrate's decision not to award spousal support.

{¶74} "In divorce * * * proceedings, * * * the court of common pleas may award reasonable spousal support to either party." R.C. 3105.18(B). "In determining whether spousal support is appropriate and reasonable, * * * the court shall consider all of the [statutory] factors." R.C. 3105.18(C). In the present case, the magistrate found as follows with respect to the statutory factors:

26

(a)     The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
Neither party is employed.

(b)     The relative earning abilities of the parties;
Plaintiff is 16 years younger than Defendant.  Her earning potential is higher than Defendant.

(c)     The retirement benefits of the parties;
Plaintiff has a TD Ameritrade IRA; Defendant has a TD Ameritrade IRA, Fidelity Rollover IRA, and a T Rowe Price Rollover IRA. Defendant's retirement accounts are significantly larger than Plaintiff's account.

(d)     The duration of the marriage;
The parties' marriage is of ten years duration.

(e)     The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage to seek employment outside the home;
This provision does not apply.

(f)     The standard of living the parties enjoyed during the marriage;
The parties enjoyed a relatively high standard of living.

(g)     The relative extent of education of the parties;
Plaintiff * * * is a graduate of Georgetown University with a degree in Economics, Finance and Political Finance; Defendant is a graduate of John Madison University with a degree in Business Administration.

(h)     The relative assets and liabilities of the parties;
Plaintiff has checking, savings, and one retirement account. Defendant has checking accounts, one investment account, and retirement accounts.  No evidence of recent balances in these accounts was presented at trial.

(i)     The contribution of each party to the education, training or earning ability of the other party;
Neither party contributed to the education, training or earning ability of the other.

(j)     The time and expense necessary for the spouse who is seeking spousal support to acquire education, training or job experience so that the spouse will be qualified to obtain appropriate employment.

27

Plaintiff testified she is working on a Series 7 license and is planning to earn an MBA. The cost for a 24 month on-line MBA at Ohio University would be $31,117.

(k)　The tax consequences, for * * * each party, of an award of spousal support;
Neither party is employed.

(l)　The lost income production capacity of either party that resulted from that party's marital responsibilities;
Both parties were voluntarily unemployed during the marriage.

(m)　Any other factor that the court expressly finds to be relevant and equitable.
The parties relied on Defendant's premarital savings to support their lifestyles during the marriage. During the pendency of the divorce, Defendant has paid an estimated $400,000 in living expenses. Plaintiff contributed nothing.

{¶75} The basis for Jennifer's objection is that the magistrate did not properly recognize Mark's earning potential. *Compare Collins v. Collins*, 9th Dist. Wayne No. 10CA0004, 2011-Ohio-2087, ¶ 46 ("the spousal support statute does not direct the court to 'impute' income, rather it contemplates a determination of the parties' relative earning ability"). Jennifer claims that the "only evidence" that Mark's earning ability was $45,000 per year as determined by the magistrate was his "self-serving statements that he would stipulate to an earning ability of $45,000." Appellant's brief at 27. This is inaccurate. Consistent with the magistrate's finding, the vocational expert, Barbara Burk, testified that Mark's present earning ability was between $30,000 and $40,000.

{¶76} Jennifer contends the magistrate failed to consider Mark's prior earning history which was in excess of $200,000 per year. However, there was considerable testimony as to why that figure was no longer a reliable indicator, such as the length of Mark's unemployment, his age, the nature of his occupation (computer sales and technology), and the circumstances of the job market in northeast Ohio.

28

{¶77} Finally, Jennifer claims the magistrate did not take into account Mark's "income received through stock trading." Although the majority of the Ameritrade brokerage account was determined to be Mark's separate property, there was abundant testimony that the ability to realize gain therefrom through active trading is considerably diminished. The nature of the market in 2009 (depressed) is not the same as it is currently (strong). Account statements regularly show unrealized losses in excess of gains and disbursements for living expenses consistently exceeded income. The balance of the account accordingly has shown steady decline. In any event, the magistrate recognized in its analysis the existence of the brokerage account as well as the fact that the value of Mark's retirement accounts is "considerably larger" than the value of Jennifer's account. These facts were duly considered. They did not require the magistrate in the exercise of her discretion to make an award of spousal support to Jennifer.

{¶78} The fourth assignment of error is without merit.

{¶79} In the fifth assignment of error, Jennifer argues the magistrate erred in calculating Mark's income for support purposes.

{¶80} "In any action in which a court child support order is issued or modified * * * the court * * * shall calculate the amount of the parents' child support and cash medical support in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of Chapter 3119. of the Revised Code." R.C. 3119.02; *Shendel v. Graham*, 2017-Ohio-4236, 92 N.E.3d 43, ¶ 41 (11th Dist.).

{¶81} "In order to determine a child-support award, a court must calculate the gross incomes of each parent." *A.S. v. J.W.*, 157 Ohio St.3d 47, 2019-Ohio-2473, 131 N.E.3d 44, ¶ 3. "Gross income" is defined broadly as "the total of all earned and unearned

29

income from all sources during a calendar year, whether or not the income is taxable," and including "dividends" and "interest" but not "[n]onrecurring or unsustainable income or cash flow items." R.C. 3119.01(C)(12); *Marrow v. Becker*, 138 Ohio St.3d 11, 2013-Ohio-4542, 3 N.E.3d 144, ¶ 11.

{¶82} Jennifer argues that the magistrate "failed to consider all of [Mark's] earned and unearned income from all sources when calculating [his] income for support purposes." Appellant's brief at 28. We agree.

{¶83} While neither Mark nor Jennifer had employment or taxable income for the majority of their marriage, their tax returns for the years 2013-2015 demonstrate both (significant) dividend and (negligible) interest income. The child support worksheet does not include this income. This omission is material in that the source of the dividends is the TD Ameritrade account which was largely determined to be Mark's separate property and will, therefore, continue to generate income for him. *Wolf-Sabatino v. Sabatino*, 10th Dist. Franklin No. 12AP-1042, 2014-Ohio-1252, ¶ 22 ("the trial court abused its discretion by failing to determine whether appellee received any dividends from these [investment] accounts and by allocating any dividends appellee received as part of her gross income"). Accordingly, the child support award is reversed and this matter is remanded for the purposes of including dividend and interest income from Mark's separate property and recalculating the award.

{¶84} The fifth assignment of error is with merit.

{¶85} In the sixth assignment of error, Jennifer challenges the magistrate's decision not to grant her a reasonable award of attorney fees and litigation expenses.

{¶86} "In an action for divorce, * * * a court may award all or part of reasonable

30

attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate." R.C. 3105.73(A). "Where a court is empowered to award attorney fees, an appellate court will not interfere with the decision '[u]nless the amount of fees determined is so high or so low as to shock the conscience[.]'" (Citation omitted.) *Lozada v. Lozada*, 11th Dist. Geauga No. 2012-G-3100, 2014-Ohio-5700, ¶ 56.

{¶87} Jennifer maintains that the magistrate "failed to cite any testimony or exhibits in support of her conclusion that [Jennifer's] attorney fees and litigation expenses were not reasonable or necessary in this matter." Appellant's brief at 31. We disagree.

{¶88} The magistrate determined that, while there was a stipulation that her trial counsel's hourly rate was reasonable, Jennifer "failed to show the hours expended were reasonable." The magistrate noted that the two main issues in the case, asset tracing and the allocation of parental rights and responsibilities, were "not novel or exceptionally complicated." The magistrate also found with respect to Jennifer's $213,540 in attorney fees that: the bill "reflect[ed] multiple calls, emails and telephone conferences with [Jennifer] on an almost daily basis from December 1, 2015 through January 31, 2018"; Jennifer "incurred significant litigation costs" associated with the retention of two experts whose services were not utilized; the bill included fees "related to a domestic violence case in Municipal Court, as well as a domestic violence civil protection order"; and Mark had already "advanced $37,500 to [Jennifer] for her attorney fees" during the course of the litigation. In light of the foregoing, we find no abuse of discretion.

31

{¶89} The sixth assignment of error is without merit.

{¶90} In the seventh assignment of error, Jennifer argues the trial court violated Civil Rule 53(D)(4) and Civil Rule 75(N) by imposing interim orders following the entry of the Magistrate's Decision until the Judgment denying her objections thereto.

{¶91} Civil Rule 53(D)(4)(e)(ii) provides: "The court may enter an interim order on the basis of a magistrate's decision without waiting for or ruling on timely objections by the parties where immediate relief is justified. The timely filing of objections does not stay the execution of an interim order, but an interim order shall not extend more than twenty-eight days from the date of entry, subject to extension by the court in increments of twenty-eight additional days for good cause shown."

{¶92} On June 25, 2018, the trial court entered two Judgment Entries, pursuant to Civil Rule 53(D)(4)(e)(ii), giving immediate effect to the Magistrate's Decision with respect to the sale of the Ashleigh Drive property and shared parenting. The interim order regarding shared parenting was modified ex parte on August 24, 2018. The trial court extended its interim rulings on the following dates: August 10, 2018; August 22, 2018; September 28, 2018; October 24, 2018; December 5, 2018; and December 11, 2018. Jennifer notes that these extensions of the interim orders were often entered after the prior orders had expired and in one instance the court extended the interim orders for a period of thirty-one days contrary to the Rule. We find no error.

{¶93} The trial court succinctly stated the "good cause" for the numerous extensions of the interim orders in its October 24 Judgment (but equally applicable to all extensions):

> It is unfortunate that this court has not been able to consider the merits of Plaintiff's Objections to the Magistrate's Decision entered

32

June 25, 2018, because of [the] size of the transcript of the testimony presented to this Court's Magistrate. Even after the transcript is completed [the transcript would be filed on November 3, 2018], a significant amount of time will be required for counsel to brief the merits of Plaintiff's 117 objections [indicated by the Preliminary Objections filed on July 9, 2018] to the Magistrate's Decision. Until such time that the Court may fully consider the Magistrate's Decision and Plaintiff's Objections to that Decision, this Court believes that good cause exists to extend the Court's Interim Orders * * *.

{¶94} We further agree with the case law holding that any issues with the extension of the interim orders has been rendered moot by adoption of the Magistrate's Order following the filing of the transcript and Supplemental Objections. "Courts have refused to address errors pertaining to the entry of interim orders, finding any error moot, because such orders terminate when the trial court enters final judgment." *Schutz v. Schutz*, 2017-Ohio-695, 85 N.E.3d 481, ¶ 86 (2d Dist.) (cases cited). Also applicable is the case law finding such errors essentially harmless in the absence of any demonstrable prejudice. *N.W. v. M.W.*, 8th Dist. Cuyahoga No. 107503, 2019-Ohio-1775, ¶ 42; *Denier v. Carnes-Denier*, 2017-Ohio-334, 77 N.E.3d 588, ¶ 44 (12th Dist.).

{¶95} Jennifer asserts that she was entitled to a hearing on the interim orders pursuant to Civil Rule 75(N). She filed Motions for Hearing Pursuant to Civil Rule 75(N) on July 17, 2018 which the trial court denied on August 10, 2018.

{¶96} Civil Rule 75(N) provides:

(1) When requested in the complaint, answer, or counterclaim, or by motion served with the pleading, upon satisfactory proof by affidavit duly filed with the clerk of the court, the court or magistrate, without oral hearing and for good cause shown, may grant a temporary order regarding spousal support to either of the parties for the party's sustenance and expenses during the suit and may make a temporary order regarding the support, maintenance, and allocation of parental rights and responsibilities for the care of children of the marriage, whether natural or adopted, during the pendency of the action for divorce, annulment, or legal separation.

33

(2) Counter affidavits may be filed by the other party within fourteen days from the service of the complaint, answer, counterclaim, or motion, all affidavits to be used by the court or magistrate in making a temporary spousal support order, child support order, and order allocating parental rights and responsibilities for the care of children. Upon request, in writing, after any temporary spousal support, child support, or order allocating parental rights and responsibilities for the care of children is journalized, the court shall grant the party so requesting an oral hearing within twenty-eight days to modify the temporary order. * * *

{¶97} We construe the Rule so that the hearing upon request to modify a temporary order only applies to temporary orders entered pursuant to section (1) of the Civil Rule, i.e., to temporary orders requested in connection with a pleading and entered upon satisfactory proof by affidavit and without oral hearing. Civil Rule 75 is clearly intended to apply to temporary orders regarding spousal support and the care and custody of children entered before a trial on the merits or other evidentiary hearing. The Rule did not entitle Jennifer to a hearing on the trial court's interim orders entered pursuant to Civil Rule 53(D)(4)(e)(ii).

{¶98} The seventh assignment of error is without merit.

{¶99} In the eighth assignment of error, Jennifer argues the trial court erred in denying her Motion for New Trial.

{¶100} Jennifer's Motion for New Trial was based on the arguments raised in her Supplemental Objections, which were attached as an exhibit to Motion for New Trial, and her Supplemental Objections raised the same arguments that are raised in assignments of error one through six. Inasmuch as the fifth assignment of error is with merit, the denial of the Motion for New Trial was in error.

{¶101} To the extent indicated in the preceding paragraph, the eighth assignment

34

of error is with merit.

{¶102} For the foregoing reasons, the Judgments of the Geauga County Court of Common Pleas, adopting the Magistrate's Decision, overruling objections thereto, and denying the Motion for New Trial are affirmed in part, reversed in part, and remanded. On remand, the trial court is instructed to reopen the hearing on custody for the limited purpose of allowing Dr. Janet Davis to testify, issue a new custody order complying, if necessary, with R.C. 3109.04(D)(1)(a)(iii), and to recalculate the amount of child support in accordance with this court's disposition of the fifth assignment of error. On remand, the court may, in its discretion, allow the parties to present additional testimony relative to issues raised in Dr. Davis' testimony. Costs to be taxed against the parties equally.

TIMOTHY P. CANNON, P.J.,

THOMAS R. WRIGHT, J.,

concur.